**PAN AMERICAN AIRWAYS, Inc. v. CIVIL AERONAUTICS BOARD.**

Nos. 9674, 9675.

United States Court of Appeals District of Columbia Circuit.

Argued June 16, 1948.

Decided Nov. 1, 1948.

Mr. Henry J. Friendly, of Washington, D. C., with whom Mr. Hugh B. Cox, of Washington, D. C., was on the brief, for petitioner.

Mr. William C. Burt, Chief, Rates Section, Civil Aeronautics Board, of Washington, D. C., with whom Mr. Edward J. Hickey, Jr., Sp. Asst. to the Atty. Gen., and Mr. Emory T. Nunneley, Jr., Gen. Counsel, Civil Aeronautics Board, Mr. Harry H. Schneider, Atty., Civil Aeronautics Board, and Mr. George Morris Fay, U. S. Atty., all of Washington, D. C., were on the brief, for respondent.

Before EDGERTON and PRETTYMAN, Circuit Judges and KEECH, District Judge, sitting by designation.

PRETTYMAN, Circuit Judge.

These cases are before us upon petitions to review two rate orders of the Civil Aeronautics Board.[1] The orders determined petitioner's compensation for carrying the mail in its Atlantic operations for the calendar year 1945 and in its Alaskan operations for the period August 1, 1944, to December 31, 1945.

Petitioner makes three points:

1. Petitioner says that the Board's decision in the Atlantic case constitutes an attempt, in a proceeding initiated in December, 1944, to recapture assets of petitioner earned and owned prior to Decem-

---

[1] Sec. 1006 of the Civil Aeronautics Act, 52 Stat. 1024 (1938), 49 U.S.C.A. § 646.

ber 7, 1941, and that such retroactive recapture is beyond the Board's power.

The statute authorizes the Board to fix fair and reasonable rates of compensation for the transportation of mail by aircraft.[2] It directs the Board to take into consideration various factors, among them "the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."[3] It has developed in some cases that the carrier had no need for mail pay in addition to reasonable compensation for services rendered; but in other cases there was such need, because all the other revenue was not sufficient to enable the carrier to meet the objectives of the statute. Administration of these provisions requires a computation of the revenues and expenses of the carrier.

Another section of the Act provides that the Postmaster General shall fix the compensation to be charged foreign countries for the transportation of their mails by air carriers certified under our statute.[4] That section further provides that a carrier may make its own collections of compensation from a foreign country or, in the absence of an arrangement between the carrier and the foreign country, collections made from such country by the United States shall be for the account of the carrier.

Petitioner initiated its Transatlantic operations in June, 1939. The Board fixed mail pay for Transatlantic carriage at a rate based on two Transatlantic trips weekly.[5] Thereafter petitioner instituted a third Transatlantic trip and petitioned the Board for a determination of mail pay covering the additional trip. Hearings were held on this petition in 1943, and the decision was handed down July 17, 1944. The Board declined to provide additional payment for the third trip, upon the ground that the payments already made for the two trips adequately compensated petitioner for all Transatlantic services performed.[6]

It appeared in that case that at the end of 1941, when the United States entered the war, certain Axis and Axis-dominated countries were indebted to the petitioner for carriage of their mail. These receivables appeared in the accounts as revenue, since the company's books were on an accrual basis. It appeared, however, at the time of the hearing and decision, that these amounts would be totally, or at least partially, uncollectible. Therefore, the Board set up against the receivables a 100 per cent reserve in some instances and a 50 per cent reserve in others. Accounts due from Germany, Greece and Hungary, totalling $406,555.44, were completely offset by a reserve, and 50 per cent of the accounts due from Portuguese Guinea and Spain, totalling $51,336.24, were offset by a reserve; the total reserves thus set up were $432,223.56. The effect of these reserves was that these receivables did not appear as income in the computations which led to the order in the Second Atlantic case. It is true that they were initially entered as revenue, but the contra entry of the reserve effectually removed them from the final net revenue figure, upon which the order of the Board was premised.

By the time the present case came before the Board, these receivables from foreign countries had become collectible, but they had not as yet been collected. The Board determined that it would not treat these amounts as income in its computation of net revenue in the test year be-

---

[2] Sec. 406(a) of the Civil Aeronautics Act, 52 Stat. 998 (1938), 49 U.S.C.A. § 486(a).

[3] Sec. 406(b) of the Civil Aeronautics Act, 52 Stat. 998 (1938), 49 U.S.C.A. § 486(b).

[4] Sec. 405(i) of the Civil Aeronautics Act, 52 Stat. 996 (1938), 49 U.S.C.A. § 485(i).

[5] Pan American Airways Co. (Del.) Transatlantic Mail Rates, 1 C.A.A. 220 (1939).

[6] The findings and opinion in this so-called Second Atlantic case do not appear in the printed volumes of the Board's decisions, but they are available in mimeographed form.

fore it, but it determined that if, as and when the amounts were collected, they must be considered as income. It, therefore, ordered that when the Postmaster General collected any of these old accounts, he should offset them against amounts otherwise due the carrier.

■ Petitioner urges that the foregoing portion of the order of the Board is, in effect, an attempt to recapture retroactively a portion of its profits theretofore allowed by an order of the Board.[7] We do not think that it is. The entry of the reserves in the former case, because of the uncollectibility of the accounts, effectively removed them from the status of income in the computations which were the basis for the prior order. If it be now held that the amounts are not income when collected, the carrier would receive $432,223.56 which the Board could not consider as income at any time. The Act does not contemplate such an eventuality. We find no statutory provision which permits it.

We find nothing in this phase of the case except the familiar situation presented when a person on an accrual accounting basis charges off a receivable as a bad debt and later collects it.

2. Petitioner contends that the Board erred in allocating to its parent company a proportion of the system expenses paid by petitioner.

The capital stock of petitioner is owned by Pan American Airways Corporation, which also owns part of the stock of three other airline companies. The parent is not an operating company. The officers and directors of petitioner and of the holding company are substantially identical. All of the salaries and the related overhead expenses of the officers, directors and other interlocking personnel are paid by the petitioner. The holding company is responsible for the procurement of all finances required by petitioner and for the conduct of all stockholder relationships.

The Board allocated to the holding company, and thus eliminated from the deductible expenses of the petitioner, an amount equal to 15 per cent of the petitioner's executive department expense, treating it as a service fee payable to the holding company.

Petitioner contends that this treatment by the Board was without evidence or other support in the record and not supported by findings.

■ The Board made long recitations of facts in what it termed its "opinions", and treated those recitations as its findings. They include in full detail the factual matter necessary upon the point at issue. The Board held, frankly, "Because of the nature of the services performed for the Holding Company and the inherent difficulties in attempting to arrive at the precise cost of such services, a judgment allocation based on the facts of record must be made." The evidence in the record covered the facts as to the interlocking personnel, a detailed description of the work done, and an analysis of the expenses of the holding corporation. A witness presented by the petitioner expressed his opinion as to the proper treatment of these system expenses. The allocation of such expenses between companies must necessarily involve a large decree of judgment.[8] We are of opinion that the allocation made by the Board was well within this permissible limit. Petitioner does not contend so much that the amount allocated was in error as that the Board could make no such allocation. But the method of accounting prescribed by the Board required the petitioner to report separately the expenses of its parent originally incurred by it.[9] We find no invalidity in that regulation; it is quite common practice. Petitioner's failure to comply with it practically necessitated the Board's "judgment allocation".

3. Appellant says that the fixation of the allowed rate of return at 7 per cent was without notice and without opportunity for petitioner to be heard.

The amount of petitioner's compensation was derived by the Board from determinations of revenue, expenses, average

---

[7] Transcontinental & Western Air v. Civil Aeronautics Board, —— U.S.App. D.C. ——, 169 F.2d 893.

[8] Colorado Interstate Gas Co. v. Federal Power Comm., 1945, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206.

[9] Sec. 828 of the Uniform System of Accounts (C.A.B. Form 2380).

investment, and an allowable rate of return. In its opinion, the Board said: "* * * we conclude that a rate of return of seven percent per annum, after Federal income taxes, is fair and reasonable in the instant case."

We held in Mississippi River Fuel Corp. v. Federal Power Comm.[10] that a general notice of investigation into rates and charges and of a hearing upon such investigation was sufficient to place in issue the rate of return, but the procedure contemplated in that case was wholly different from that in the present case.

The Rules of Practice of the Board[11] provide that a rate proceeding may be commenced by a petition of a carrier, or of the Postmaster General, or by an order of the Board. In the latter event, the proceedings "will normally be instituted by the issuance of an order directing the parties to show cause why a specified rate or rates set out in such order should not be fixed and determined by the Board."[12] This tentative rate is determined on the basis of the monthly and annual reports of the carrier and other information available to the Board.[13] After the issuance of the order, any party having objections to the tentative rate files them.[14] If the proceeding is instituted upon petition of the carrier, the Board, before proceeding further, will normally issue an order similar to the one just described, directing the parties to show cause why a specified rate should not be fixed.[15] In any proceeding, the examiner designated to conduct the proceeding may call a conference to consider, among other things, "The formulation of the issues to be considered at the hearing".[16] The procedure provided by the Rules of Practice was followed in these cases.

The Atlantic case[17] was instituted by the Board by an order to show cause, accompanied by a "Statement of Tentative Findings and Conclusions". The tentative finding and conclusion was that $1.50 per mail ton-mile was fair and reasonable, and the Board's "Statement" recited that the net over-all profit upon that basis "is equal to a return of 9.4 percent per annum on the $2,809,453 average investment found to be used and useful in the common carrier service." The petitioner entered no exception to this announced rate of return. No reference to the rate of return appears in the statement of issues formulated after the pre-hearing conference in the case, except that, in an appendix to the pre-hearing conference report, Public Counsel noted his intention to introduce an exhibit or exhibits on the subject, which he stated would relate to "the adequacy of the rate of return provided for in the Tentative Statement". He did not offer such an exhibit.

The Alaska case[18] originated with a petition filed by petitioner, seeking a determination of its mail rate for its Alaska service. No tentative rate was proposed by the Board. A pre-hearing conference was held and a statement of issues formulated. No issue was stated concerning the rate of return. The two cases were consolidated for hearing, and extensive hearings were had. No evidence in respect to the rate of return was proffered at the hearing. As a matter of fact, when the first witness presented by the carrier was under cross-examination by Public Counsel, the following occurred:

"Q. There is no attempt in this exhibit to support any particular rate of return for Pan American in this proceeding, then?

"A. I didn't know that that was an issue."

Nobody challenged the witness's understanding of the matter. Thereafter oral

---

[10] 1947, 82 U.S.App.D.C. 208, 163 F. 2d 433.

[11] 14 Code Fed.Regs. § 285.1 et seq. (Cum.Supp.1944), as revised, 14 Code Fed.Regs. § 285.1 et seq. (Supp.1946).

[12] 14 Code Fed.Regs. § 285.11(b) (Cum. Supp.1944). We quote and cite from the Rules in effect at the institution of the case, although the revised Rules (14 Code Fed.Regs. § 285.1 et seq. (Supp.1946) were made applicable to the latter stages of the case by stipulation. There is no material difference.

[13] 14 Code Fed.Regs. § 285.11(b) (3) (Cum.Supp.1944).

[14] Id. § 285.11(c) (1).

[15] Id. § 285.11(b) (2).

[16] Id. § 285.10(a).

[17] Docket No. 1706 before the Board; now No. 9674 in this court.

[18] Board Docket No. 1499; now No. 9675 in this court.

argument was had before the Board, but that subject was not argued.

It seems apparent from the foregoing that the Rules of Practice and Procedure of the Board contemplate a preliminary formulation of issues, that no issue was framed as to the rate of return in these cases, and that no evidence relating to the subject was received. We, therefore, must conclude that the Board's finding of a rate of return of 7 per cent, being 2.4 per cent less than its announced proposed allowable rate, was without the notice and opportunity to be heard on the part of petitioner which is requisite to the validity of the Board's order on that matter.[19] The cases must, therefore, be remanded for notice, hearing and finding in respect to the allowable rate of return.

It follows from the foregoing that the orders of the Board are affirmed, except that so much of the orders as relates to the rate of return will be set aside and the cases remanded for further proceedings in accordance with this opinion.

Affirmed in part and remanded.

---

[19] Sec. 406(a) of the Civil Aeronautics Act, 52 Stat. 998 (1938), 49 U.S.C.A. § 486(a); Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129.