**CHESAPEAKE AND POTOMAC TELEPHONE COMPANY,**
Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA,**
Respondent,

**Office of People's Counsel, Intervenor.**

No. 85–1662.

District of Columbia Court of Appeals.

Argued June 10, 1986.
Decided Sept. 10, 1986.

Edward D. Young, III, with whom Lee A. Satterfield, D. Michael Stroud, Gregg C. Sayre, and Mark J. Mathis, Washington, D.C., were on brief, for petitioner.

Howard C. Davenport, with whom Mary J. Sisak and Gilbert E. Hardy, Washington, D.C., were on brief, for respondent. Roberta Willis Sims and Charles L. Reischel, Washington, D.C., also entered appearances for respondent.

Frederick D. Dorsey, People's Counsel, Elizabeth A. Noel, Deputy People's Counsel, Joanne Doddy Fort, and Ronald C. Jessamy, Washington, D.C., were on brief for intervenor.

Before FERREN, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

This is the first telephone rate case to reach this court since the breakup of the Bell System on January 1, 1984. On that date the Chesapeake and Potomac Telephone Company (C & P), which had formerly been a subsidiary of American Telephone and Telegraph Company (AT & T), became a subsidiary of Bell Atlantic Corporation (Bell Atlantic). This case requires us to examine some of the effects of that change on the rates paid by District of Columbia subscribers for their telephone service.

On August 24, 1984, C & P filed an application with the Public Service Commis-sion requesting authority to increase and restructure its schedule of rates and tariffs for telephone service in the District of Columbia. The proceedings on this application became Formal Case No. 827 before the Commission. After extensive hearings, the Commission issued Order No. 8300 authorizing C & P to earn some, but not all, of the additional revenues it had requested. C & P, the Office of People's Counsel (OPC), and the General Services Administration all applied for reconsideration of that order, and in Order No. 8329 the Commission granted C & P's application in part and denied it in part. C & P then appealed to this court.

C & P contends that the Commission acted arbitrarily and capriciously when it (1) disallowed recovery of certain expenses for services performed by Bell Atlantic Corporate Services, Inc.; (2) imposed a limitation of one percent of intrastate operating revenues on Bell Communications Research, Inc., research expenses; (3) rejected C & P's proposed surcharge to recoup the estimated loss of Billing Inquiry Service revenues; (4) ordered C & P to refund to its ratepayers certain license contract fees, previously paid by C & P to AT & T, for which C & P had been reimbursed; and (5) refused to correct three alleged mathematical errors. We reverse as to items (1) and (2) and affirm as to items (3) and (4). As to item (5), we reverse as to two of the mathematical errors, but in light of our reversal on item (2), we do not reach the third.

## I. THE STANDARD OF REVIEW

 The scope of this court's review of a Commission order is defined by D.C.Code § 43–906 (1981), which states:

In the determination of any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such find-

ings of the Commission are unreasonable, arbitrary, or capricious.

*See also Washington Public Interest Organization v. Public Service Commission,* 393 A.2d 71, 75 (D.C.1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). The Commission, not this court, must balance the competing interests of utility consumers and investors in the rate-making process. *People's Counsel v. Public Service Commission,* 455 A.2d 391, 393 (D.C.1982). In our review of rate orders, "[i]t is especially important to accord great respect to the Commission in a complex esoteric area such as rate making in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies." *Goodman v. Public Service Commission,* 162 U.S.App.D.C. 74, 78–79, 497 F.2d 661, 665–666 (1974), quoted in *People's Counsel v. Public Service Commission, supra,* 455 A.2d at 333. Indeed, we have repeatedly said that our review of a ratemaking order by the Commission "is the narrowest judicial review in the field of administrative law." *Potomac Power Co. v. Public Service Commission,* 402 A.2d 14, 17 (D.C.) (en banc), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); *accord, e.g., Washington Gas Light Co. v. Public Service Commission,* 483 A.2d 1104, 1168 (D.C.1984). Thus a party seeking to overturn a Commission order "carries the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *Washington Gas Light Co. v. Public Service Commission,* 450 A.2d 1187, 1194 (D.C.1982) (citations omitted). That burden is not met by merely proposing an acceptable alternative to the Commission's actions. *People's Counsel v. Public Service Commission, supra,* 455 A.2d at 384.

■ Before a Commission order may be affirmed, however, "the Commission must indicate 'fully and carefully the methods by which, and the purposes for which, it has chosen to act....'" *Washington Gas*

*Light Co., supra,* 450 A.2d at 1193, quoting from *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

> [This] court ... has a responsibility to hold the Commission accountable—through as many remands as necessary—for satisfying a burden all its own: to explain its actions fully and clearly. A utility rate cannot be deemed "reasonable" simply because an expert agency says it is. Independent of a petitioner's burden to show convincingly that a Commission-prescribed rate is unreasonable, the Commission ... has the burden of showing fully and clearly why it has taken the particular ratemaking action. Absent such comprehensive explanation, judicial review of the Commission's substantive decisions cannot be completed and the rate order finally approved—or set aside.

*Washington Public Interest Organization, supra,* 393 A.2d at 75. To satisfy this requirement, the Commission must state on the record "the criteria governing the rate determination" and must explain "how the particular rate order reflects application of these criteria to the facts of the case." *Id.* at 75.[1] Only when the Commission has given the required full and careful explanation is its ruling entitled to deference. *Washington Gas Light Co. v. Public Service Commission,* 452 A.2d 375, 379 (D.C.1982), *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983).

## II. THE CSI EXPENSES

■ C & P contends that the Commission acted arbitrarily when it disallowed recovery from the ratepayers of the expenses C & P had incurred for services performed by Bell Atlantic Corporate Services, Inc. (CSI). We reverse this part of the Commission's order and remand for further proceedings.

---

**1.** "This need for explicit criteria follows from the fact that in each case there will be a 'zone of reasonableness,' ... with boundaries which the

Commission must define and apply." *Washington Public Interest Organization, supra,* 393 A.2d at 76 (citations omitted).

CSI, a subsidiary of Bell Atlantic, provides centralized corporate services such as treasury operations, investor relations, financial and tax planning, corporate communications, legal advice, and administration of employee benefits to both the regulated and unregulated subsidiaries of Bell Atlantic, including C & P. CSI bills the costs associated with the regulated subsidiaries to Bell Atlantic Management Services, Inc. (MSI), which then bills C & P and the other regulated companies according to established cost allocation factors. Work performed by CSI for unregulated entities is billed directly to them. Order No. 8300 at 109.

Traditionally, the Commission has taken the position that C & P has a "special burden" to justify the reasonableness of expenses incurred by one of its affiliates. *Chesapeake & Potomac Telephone Co.,* 43 Pub.Util.Rep. 4th 169, 207 (D.C.PSC 1981). Recently the Commission expressed its concern over the growth in centralized service expenses and the lack of control by C & P over those expenses charged to ratepayers. *See Chesapeake & Potomac Telephone Co.,* 56 Pub.Util.Rep. 4th 53, 87 (D.C.PSC 1983). The Commission announced that in the future none of the centralized service expenses could be charged to the ratepayers unless they were "properly identified, justified, and supported in the record, on an activity-by-activity basis." *Id.* at 89. In addition, the Commission required C & P to prove that the expenses were reasonable and that they benefited the ratepayers of the District of Columbia. *See* Order No. 8300 at 114 n. 54.

In the present case, the Commission found that although C & P had "basically provided the necessary information regarding the activity-by-activity costs and the methods of allocation" of CSI's services and expenses, "it ha[d] not fully met its

burden of proof as to a justification for all of those costs." Order No. 8300 at 114.[2] The Commission concluded that "sufficient justification for all of the CSI expenses simply does not exist," mainly because "the allocation method employed is based upon a measure of capital" and because "this may well work to the detriment of capital-intensive companies." *Id.* In the Commission's view, no attempt had been made "to segregate costs according to the actual extent of usage of CSI services by the various [operating companies]," and the C & P witnesses had failed to provide "sufficient assurance that ... C & P has not been allocated the expenses of services used by other entities." *Id.* The Commission therefore disallowed all CSI expenses.

C & P challenged this decision in a motion for reconsideration, principally asserting that the Commission was mistaken in its belief that CSI expenses were allocated on the basis of the operating companies' capital. The Commission, however, reaffirmed its earlier decision on the ground "that C & P in its testimony simply did not provide 'sufficient assurance that the costs are fairly allocated', i.e., that C & P had not met its burden of proof sufficiently." Order No. 8329 at 3, quoting from Order No. 8300 at 114. The Commission expressly stated that it recognized "that the CSI expenses are not allocated solely on the basis of capital." Order No. 8329 at 3.

The Commission has only partially met its obligation "to explain its actions fully and clearly." *Washington Public Interest Organization, supra,* 393 A.2d at 75. It did announce the criteria by which it would decide whether CSI expenses might be allowed:[3] the expenses had to be "identified, justified, and supported in the record, on an activity-by-activity basis." *Chesapeake & Potomac Telephone Co., supra,* 56 Pub. Util.Rep. 4th at 89. The Commission

**2.** The Commission declared that sufficient evidentiary support was particularly necessary for CSI expenses because CSI provided services to unregulated as well as regulated companies, and because "CSI employs a somewhat different allocation methodology in billing MSI, which in

turn employs its own allocation methodology in billing C & P." Order No. 8300 at 114–115.

**3.** *See Washington Public Interest Organization, supra,* 393 A.2d at 75.

failed, however, to explain "how the particular rate order reflect[ed] application of these criteria to the facts of the case." *Washington Public Interest Organization, supra,* 393 A.2d at 75. The Commission never adequately explained why, if C & P "basically provided the necessary information regarding the activity-by-activity costs and the methods of allocation," Order No. 8300 at 114, as it had been instructed to do, it nonetheless failed to meet its burden of proof.[4]

The Commission stated as reasons for its action that there was no attempt to segregate costs according to the actual extent of usage of CSI services by the various operating companies and that "the problem relate[d] principally to the fact that the allocation method employed is basically based upon a measure of capital." Order No. 8300 at 114; *see also* Order No. 8329 at 3. For three reasons, this meager explanation does not support the Commission's decision.

First, the Commission recognized that capital was only one of several bases for allocation of expenses, yet it also found that "the allocation method employed [was] basically based upon a measure of capital." Order No. 8300 at 114. The Commission cannot have it both ways: it cannot recognize that capital is one of several factors in the allocation method while concluding that C & P failed to meet its burden because the allocation method is "basically based upon a measure of capital." These two propositions are inherently inconsistent. Second, in its motion for reconsideration C & P asserted that 44 percent of the CSI expenses were allocated on non-capital bases.

The Commission never explained why, as to these expenses, the allocation methods used may have caused C & P to pay more than its fair share of the CSI expenses. What may have been true for the 56 percent of expenses that were capital-based was not necessarily true for the 44 percent that were not capital-based. The Commission failed to recognize this distinction or to take it into account in its ruling.[5]

Most importantly, the Commission failed to make a finding as to whether C & P actually was allocated expenses for services provided to other companies. A fundamental principle of utility regulatory law is that "properly incurred" expenses "must be allowed as part of the composition of the rates." *Mississippi River Fuel Corp. v. FPC,* 82 U.S.App.D.C. 208, 212, 163 F.2d 433, 437 (1947). Without a finding on the issue of whether the expenses C & P claimed were or were not properly allocated to C & P, we cannot determine whether C & P will be allowed to recover its properly incurred expenses or whether the Commission's order disallowing the CSI expenses is supported by substantial evidence, as we are required to do.

In sum, we hold that the Commission inadequately explained its decision and thus failed to carry its burden. *See Washington Public Interest Organization, supra,* 393 A.2d at 75–77. "The Commission's failure may be attributable to the utility companies' own failure, as proponents of the order, to supply a sufficient quality of evidence in support; or the Commission's failure may be due solely to its insufficient explanation of the reasonable-

---

4. This statement, in and of itself, is illogical and unclear and thus, unless adequately explained, requires a remand. *See Washington Public Interest Organization, supra,* 393 A.2d at 75 (the Commission must explain its actions "clearly").

5. Despite the 44 percent figure proffered in C & P's motion for reconsideration, the Commission never determined whether any of the CSI expenses were allocated on bases other than capital, apparently because it felt that such a finding was unnecessary. *See* Order No. 8329 at 3. We believe that such a finding is essential. On

remand, even if the Commission adequately explains why the capital-based expenses are not recoverable from the ratepayers, it must also determine the percentage of CSI expenses allocated on non-capital bases and explain why *those* expenses are or are not recoverable. In other words, the Commission may not lump capital-based and non-capital-based expenses together in deciding whether expenses in either category may be passed through to the ratepayers.

ness of the order. In either event, a remand [is] necessary." *Id.* at 76–77.[6]

### III. THE BELLCORE EXPENSES

 C & P contends that the Commission's decision to impose a one percent cap on Bell Communications Research, Inc. (Bellcore), expenses was arbitrary, capricious, and not supported by the evidence. We reverse the Commission's decision on this point, but not for the reasons urged by C & P.

Bellcore is the successor to Bell Telephone Laboratories, Inc. It is owned by the seven regional telephone holding companies which were created in the course of AT & T's divestiture of its operating companies.[7] It was established to

> perform the coordination for national defense and other emergency purposes that is vital to the nation's security ... [and to] set the standards which will permit telecommunications to continue to operate in an engineering sense as one national network.

*United States v. Western Electric Co.,* 569 F.Supp. 1057, 1119 (D.D.C.1983) (footnote omitted).

The allocation of costs for Bellcore expenses depends upon the type of research project involved. Bellcore activities are designated as either "core" or "non-core" projects. A core project is one which the Bellcore board of directors has determined by at least a five-to-two vote will be of substantial benefit to the seven owners. The costs of all core project are allocated among the seven regional holding companies on an equal basis, including those whose representatives on the board voted against it. A non-core project is one in which participation is optional. It requires only a four-to-three vote to authorize the commencement of work, and its costs are allocated to only those regional holding companies electing to participate. Core projects greatly outnumber non-core projects.

In this case the Commission imposed a limit of one percent of C & P's intrastate operating revenues on recoverable Bellcore expenses because it concluded that those expenses were "not, in total, adequately justified." Order No. 8300 at 115. The Commission was particularly troubled by recent increases in Bellcore costs and by the lack of control that Bell Atlantic, and in turn C & P, had over them; on the other hand, the Commission recognized that certain of those costs were reasonable. Noting that "various other jurisdictions" had imposed a one percent ceiling, the Commission concluded that such a ceiling was "reasonable for purposes of this case in light of the failure of C & P to justify fully all of its costs." *Id.*

We reverse this part of the Commission's order and remand the case for further proceedings. Without further explanation, the Commission's decision to impose a one percent ceiling on Bellcore expenses is arbitrary on its face. The Commission did not state the criteria by which it purported to decide the reasonableness *vel non* of the Bellcore expenses, nor did it explain how its rate order reflected application of those criteria to the facts of this case. It must do both of these things before the one percent limit may be upheld. *Washington Public Interest Organization, supra,* 393

---

**6.** We reject C & P's argument that the Commission departed from past practices without giving adequate justification by disallowing the CSI expenses because they are allocated on the basis of capital. *See Office of People's Counsel v. Public Service Commission,* 482 A.2d 404, 414 (D.C.1984). The Commission did not disallow the CSI expenses on that ground but on the ground that, in its view, C & P had failed to meet its burden of proof in demonstrating that the costs were justified and fairly allocated. In prior cases, the Commission has disallowed recovery of expenses when C & P failed to provide an adequate justification for them. *See Chesapeake & Potomac Telephone Co., supra,* 56 Pub. Util.Rep.4th at 81–89; *Chesapeake & Potomac Telephone Co., supra,* 43 Pub.Util.Rep.4th at 207–211. The Commission's decisions in those cases, of course, are not binding on us, but they suffice to put C & P on notice that the Commission requires such justification.

**7.** Bell Atlantic is one of those seven companies.

A.2d at 75; *see also People's Counsel v. Public Service Commission*, 462 A.2d 1105, 1108 (D.C.1983) (a reviewing court cannot tell if the end result is reasonable unless it can examine the steps which lead to that result). The Commission imposed the one percent ceiling on Bellcore expenses without even attempting to explain why the expenses above that ceiling were, in its view, unreasonable. The fact that other state regulatory commissions may have imposed such a ceiling is utterly irrelevant here, for neither the Commission nor this court can know what evidence was before those tribunals when they made their rulings. As far as the record in *this* case discloses, the one percent figure was simply plucked out of the air.

"Absent precise explanation of methodology as applied to the facts of the case, there is no way for [this] court to tell whether the Commission, however expert, has been arbitrary or unreasonable.... [W]ithout insisting on more precise explanation, [we] could simply be fooled into accepting arbitrary agency action by the mesmerizing influence of the confidently expressed language of experts." *Washington Public Interest Organization, supra*, 393 A.2d at 77–78. We remand the case to the Commission for further proceedings with regard to the Bellcore expenses. If C & P can demonstrate that

they are "properly incurred," then the Commission shall allow them to be recovered in full from the ratepayers. *Mississippi River Fuel Corp. v. FPC, supra*, 82 U.S.App.D.C. at 212, 163 F.2d at 437. If the Commission concludes that C & P has not justified the Bellcore expenses and disallows them in whole or in part, it shall state its reasons for doing so with particularity, in a manner consistent with our decision in *Washington Public Interest Organization, supra*.[8]

## IV. THE LOSS OF BIS REVENUES

■ C & P asserts that the Commission should have approved its request to recoup from District of Columbia ratepayers $3,270,000 in revenues which C & P estimated it would lose as a result of the termination of its Billing Inquiry Service (BIS) agreement with AT & T. We affirm the Commission's ruling on this issue.

At divestiture AT & T lacked the facilities to handle inquiries from its customers about their long distance telephone bills. C & P agreed to provide this service to AT & T temporarily until AT & T could set up its own system for billing inquiries. Prior to the hearing before the Commission, AT & T had announced plans to discontinue its

8. In view of our decision to remand on this point, we need not consider C & P's contention that the Commission should have used different revenue figures to calculate the ceiling. If the Commission on remand decides to abandon the ceiling, this issue will be moot. If it retains the ceiling and provides an adequate explanation of its reasons for doing so, C & P may renew its argument that the ceiling should be based on imputed revenues rather than test year revenues.

We reject C & P's assertions that the Bellcore expenses are not increasing and that Bell Atlantic does not lack control over Bellcore projects. Evidence was introduced that the expenses had increased by $108,000 since C & P's previous ratemaking proceeding, Formal Case No. 798, and that Bell Atlantic, of which C & P is only a part, has only one vote out of seven on Bellcore's board of directors. Thus we conclude that the Commission's decision on these points is supported by substantial evidence.

We also hold that the Commission adequately fulfilled its "special duty to explain" its decision to impose a ceiling after several times rejecting it. *See Office of People's Counsel v. Public Service Commission, supra* note 6, 482 A.2d at 414. The Commission decided to adopt the cap because of the recent increases in Bellcore expenses and what it perceived to be a continued lack of control over Bellcore expenses by C & P. Order No. 8300 at 115; Order No. 8329 at 4–5; *see also Chesapeake & Potomac Telephone Co., supra*, 56 Pub.Util.Rep.4th at 87–88. Although we hold that the Commission's actual imposition of a ceiling was flawed, we are satisfied that the decision to impose one was supported by "a reasoned analysis indicating that prior policies and standards [were] being deliberately changed, not casually ignored...." *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (footnote omitted).

subscription to C & P's BIS because it could now provide the service for itself.

The Commission gave three separate reasons for its decision to disallow recovery of the BIS revenues which C & P was about to lose. First, it held that C & P's proposal did not meet the established "known and certain" standard for changes in expenses which occur outside of the test year. Second, C & P sought to recoup its lost revenues in the form of a surcharge, and the Commission ruled that C & P had not met the heightened standard for approval of a surcharge (as opposed to a rate adjustment). Third, the Commission expressed "concern" that C & P had not raised this issue until five months after it had filed its application for a rate adjustment, and ruled that C & P had not justified its tardiness. We hold that the Commission's first ground is sufficient to sustain its ruling, and thus we do not consider the second and third.

As a matter of long-standing policy, the Commission permits adjustments to test year figures for "known and certain" changes in operating expenses and revenues which occur within a reasonable time after the test year, as long as the record is still open. *See* Order No. 8300 at 83; *Potomac Electric Power Co.,* 29 Pub. Util. Rep. 4th 585, 590 (D.C.PSC 1979); *see also New England Telephone & Telegraph Co. v. Public Utilities Commission,* 470 A.2d 772, 775 (Me.1984). In this case, however, it rejected C & P's request for such an adjustment because the changes were not known and certain. At the time of the hearing in this case, the Federal Communications Commission (FCC) had recently issued an interim order stating that it then had under consideration measures designed to provide relief at the interstate level to operating companies (such as C & P) which were faced with the prospect of lost revenues due to AT & T's termination of BIS contracts. 50 Fed.Reg. 26204 (1985). Some of those revenue losses would probably have to be made up by adjustments in intrastate rates. The effect of the FCC

order, however, was to render the proper amount of such adjustments uncertain.

The purpose of the interim order was to establish measures for the allocation of costs in what is known as Account 645, which includes BIS costs. In its order the FCC adopted a formula by which adjustments were to be made in the access charge tariffs of the local Bell Operating Companies (BOCs) in order to ensure proper recovery of the interstate portion of Account 645 costs and of other related expenses. *Id.* at 26205–26208; *see also* 47 C.F.R. § 67.365 (1985). The formula made the amount of recovery of the interstate portion of those costs "known and certain," but only for the duration of the interim order. That order was to remain in effect for one year from the date on which AT & T began to provide billing inquiry services itself, or until the FCC issued an order setting up permanent allocation procedures for Account 645. 50 Fed.Reg. at 26206–26208; *see* 47 C.F.R. § 67.365 (1985).

At the time of the proceedings in this case before the Commission, neither the date when the FCC's permanent order would take effect nor the amounts of the interstate adjustments in the access charge tariffs that would be permanently ordered by the FCC were known or knowable. Since the amount of relief to be provided by the FCC at the interstate level would likely change within the period for which C & P's rates were being set in this proceeding, and since the date of that change was not fixed, the Commission ruled that it would be premature to make the adjustments requested by C & P. The Commission also ruled that C & P should first seek relief from the FCC, under the procedures established in the interim order, before attempting to recoup its loss of the BIS revenues from District of Columbia ratepayers. Order No. 8300 at 147–149.

On this issue the Commission's decision is entirely sound. Its reasoning is persuasive, and its ruling is supported by substantial evidence, namely, the FCC order itself. We therefore affirm the denial of C

& P's request to recover the lost BIS revenues.[9]

## V. THE REFUNDED LICENSE CONTRACT FEES

■ The Commission ordered C & P to refund to its ratepayers $2,160,465 in license contract payments previously made to AT & T, which AT & T had paid back to C & P over a twenty-one month period from December 1982 to August 1984. C & P contends that this portion of the Commission's order is illegal and arbitrary. We disagree.

The funds at issue were originally advanced by C & P to AT & T to pay development and formation expenses for American Bell, Inc. (AmBell), before AmBell began its customer premises equipment (CPE) operations. In November 1982 the FCC determined that the local Bell Operating Companies (BOCs) would no longer benefit from the operation of AmBell. The FCC therefore directed AT & T to reimburse the BOCs, including C & P, for these expenses, "to assure that ratepayers will be reimbursed for *funds that they have provided for these activities* and for which they are not the beneficiaries." *American Telephone & Telegraph Co.,* 91 F.C.C.2d 578, 593 (1982) (emphasis added). In response to the FCC order, AT & T paid approximately $1.8 million to C & P in 1982 and 1983, and $0.3 million in 1984. As C & P received these reimbursements, it placed them in a deferred account, where they earned no return for C & P. The reimbursements were never a part of C & P's rate base. The Commission eventually ordered all of this money, $2.1 million, to be refunded to the ratepayers.

Because the state regulatory commissions were in a better position to weigh any facts that might affect the amount of the refunds, the FCC left it to those commissions to decide how much should be refunded to the intrastate ratepayers and how those refunds should be made. To facilitate state commission review, the FCC directed AT & T to file with each state commission a copy of a report, to be filed concurrently with the FCC, detailing the full amount of reported AmBell expenses allocated to each ratemaking jurisdiction. In addition, the FCC required the BOCs to report this information to their respective state regulatory commissions in conjunction with the first ratemaking proceeding following the reimbursement. 91 F.C.C.2d at 603–604.

C & P asserts that it furnished the required information to the Commission in a previous ratemaking proceeding, Formal Case No. 798, and that the Commission had an opportunity to order a refund in that case but failed to do so. Therefore, C & P argues, the Commission acted unlawfully by ordering the refund in this case. We disagree. Under the FCC order, C & P was required, "in conjunction with the first ratemaking proceeding following the reimbursement," to "present the allocated [AmBell] expenses again to [the Commission] for ratemaking scrutiny." 91 F.C.C.2d at 603. C & P did not do this in case No. 798. As the Commission points out in its brief, without contradiction by C & P, the limited information on the license contract reimbursement which C & P provided in that case was merely "accounting data required to be submitted as background information in support of [its] application for rate relief"; it was not the kind of information contemplated by the FCC order. Since C & P did not provide the Commission with the necessary data in case No. 798, the Commission's consideration of the reimbursements in the instant case was entirely proper.

**9.** C & P also argues that the Commission's decision to deny a surcharge for the loss of BIS revenues was arbitrary and capricious because the Commission had previously approved surcharges in indistinguishable situations, namely, for the Subscriber Plant Factor (SPF) charge and the E911 investment. We disagree. The effects of both the SPF charge and the E911 investment were known and certain, or would be before the surcharge could begin, unlike the effect of the BIS revenue loss. There is thus a rational basis for distinguishing this case from those two prior cases.

■■■ As to the merits of the refund order, C & P argues that the Commission engaged in illegal retroactive ratemaking. C & P correctly points out that "the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations" and that "[p]rofits of the past cannot be used to sustain confiscatory rates for the future." *Board of Public Utility Commissioners v. New York Telephone Co.,* 271 U.S. 23, 32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926); *see People's Counsel v. Public Service Commission,* 472 A.2d 860, 866–867 (D.C.1984); *Washington Gas Light Co., supra,* 450 A.2d at 1217; *Payne v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 321, 330–331, 415 F.2d 901, 910–911 (1968). The refund ordered by the Commission, however, did not come from "accumulations from past operations" or "profits of the past"; rather, it was intended to restore to the ratepayers what they themselves had invested in a project that was no longer of any benefit to them. *Cf. Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 158 U.S. App.D.C. 7, 27, 485 F.2d 786, 806 (1973) ("he who bears the financial burden of particular utility activity should also reap the benefit resulting therefrom").

The license contract fees that C & P paid to AT & T for the development of AmBell came directly from the ratepayers. The money never belonged to C & P; C & P was merely a conduit through which the funds passed from the ratepayers to Am-Bell. Originally it was expected that the ratepayers would benefit from the use of this money for the AmBell project. When the FCC determined otherwise, AT & T was ordered to reimburse C & P and the other BOCs for their pre-operational contributions to AmBell. The Commission then ordered these funds refunded to C & P ratepayers. This history makes clear that the funds which the Commission ordered to be reimbursed to the ratepayers represented the ratepayers' capital investment in the AmBell project, not C & P's "accumulations from past operations." Since C & P never had any right to the money in the first place, it cannot complain that the Commission, following the lead of the FCC,[10] gave it back to the ratepayers.

Thus we hold that there was no retroactive ratemaking in this case. The refund order was not retroactive in the forbidden sense. *See Board of Public Utility Commissioners v. New York Telephone Co., supra,* 271 U.S. at 32, 46 S.Ct. at 366. Nor was it even a ratemaking order; rather, it was a refund to the ratepayers of their own capital investment, entirely separate from the ratemaking process.[11]

---

**10.** With respect to the AmBell funds within its jurisdiction, the FCC declared its "inten[tion] that the full amount of *interstate* preoperational expenses shall be recovered by ratepayers." *American Telephone & Telegraph Co., supra,* 91 F.C.C.2d at 602 (emphasis added).

**11.** C & P also argues that, in ordering the refund, the Commission neglected to consider the reasonableness of C & P's rates as a whole, which it claims the Commission was required to do, citing *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa. Commw. 102, 143–144, 464 A.2d 546, 565–567 (1983). *National Fuel Gas* does not support C & P's argument. The refund in *National Fuel Gas* involved revenues from transactions which were generally unregulated by state public utility commissions. *Id.* at 143, 464 A.2d at 565. In the present case, the refund did not arise from revenues but rather from reimbursements from

AT & T for a project from which C & P and its ratepayers would no longer reap benefits. Since the refund was not revenue, the Commission was not required to consider the effect of the refund on the overall reasonableness of C & P's rates.

Equally without merit is C & P's related argument that the Commission's decision to order a refund of reimbursements received during periods when C & P failed to earn its authorized rate of return violates fundamental ratemaking principles. If the Commission, in order to compensate C & P for its past earnings shortfall, had withheld the refund from the ratepayers, *that* would have been retroactive ratemaking. *See Nader v. FCC,* 172 U.S.App.D.C. 1, 21, 520 F.2d 182, 202 (1975) ("a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle"); *Payne v. Washington Metropolitan Area Transit Commission, supra,* 134 U.S.App.D.C. at 330, 415 F.2d at

## VI. THE COMMISSION'S MATHEMATICAL ERRORS

C & P also contends that the Commission's refusal to correct three alleged mathematical errors which it identified in its application for reconsideration was arbitrary and capricious. We agree with C & P as to two of the errors. We do not reach the third because it may become moot on remand; see note 8, *supra*, first paragraph.

### Error No. 1

■ C & P originally proposed an adjustment in its rate base that would decrease its net operating income by $31,000 to account for the effect of an increase in the Federal Insurance Contribution Act (FICA) tax. The Commission recalculated the FICA tax adjustment because it had made other adjustments in computations relating to the number of employees retained in C & P's work force during the rate period. In its application for reconsideration, C & P argued that the Commission's computation was incorrect because it had double-counted the reduction in FICA taxes. *See* Order No. 8329 at 18–19. C & P then offered another calculation of the adjustment. Although the Commission rejected C & P's new figure as incorrect, it conceded that the argument that its own original figure was incorrect had "some merit." Nevertheless, since C & P's new figure was incorrect and the Commission was unable from the data then before it to calculate the precise adjustment that should be made, the Commission denied C & P's application for reconsideration on this point.

This denial was arbitrary and capricious. Because the Commission based its decision on admittedly incorrect data, the decision was not supported by substantial evidence. The required " 'rational connection between facts found and the choice made,' " *Washington Public Interest Organization, su-*

910 (utility may not charge higher rates in the future to recoup past losses).

*pra*, 493 A.2d at 77 (citation omitted), is not present. The Commission's failure to base its decision on substantial evidence in the record, when it could readily have obtained the correct data under its own rules,[12] requires us to remand the case for recomputation of the . correct FICA adjustment. *See id.* at 77–78.

### Error No. 2

■ In Order No. 8300, the Commission decided to allow C & P to seek permission from the FCC to shift from a seven-year to a three-year schedule for the amortization of its investment in complex inside wiring. Although C & P did not dispute the correctness of the Commission's decision, it did challenge, in its application for reconsideration, the Commission's calculations of the increase in the revenue requirement resulting from the shift to the shorter amortization period. C & P complained that the Commission had overlooked the deferred tax effect of the change in the revenue requirement, with the result that an additional $388,000 in revenue requirement should have been recognized.

In Order No. 8329, the Commission reviewed C & P's calculations and concluded that C & P might be correct. Nevertheless, it rejected C & P's new figures because C & P had had "ample opportunity to bring this matter to our attention at a much earlier point in this proceeding," but had not explained its failure to do so. Order No. 8329 at 20–21.

We cannot uphold that decision. As the Commission all but admits, the current calculation of the effect on C & P's deferred taxes of the change in the amortization of inside wiring is not supported by substantial evidence. The Commission also admits that the correct figures were available in the record after the application for reconsideration was filed. Under the Commission's own rules, an application for recon-

12. Under 15 DCMR § 140.6 (1985), if the Commission agrees to reconsider a decision, it may in its discretion hold further hearings.

sideration is the appropriate means for "set[ting] forth specifically the grounds on which the applicant considers the order or decision of the Commission to be ... erroneous." 15 DCMR 140.2 (1985). In light of this rule and of the lack of substantial evidence to support the Commission's calculations, we hold that the Commission's refusal to use the correct figures merely because C & P did not provide them earlier was arbitrary and capricious. On remand the Commission shall recalculate the revenue requirement, using the correct figures.

## VII. CONCLUSION

For the reasons set forth in this opinion, the decision of the Commission from which this appeal is taken is

*Affirmed in part, reversed and remanded in part.*