*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-AA-0225

KASSAHUN A. WOLDEMDHIN, PETITIONER,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT.

Petition for Review of an Order of the
District of Columbia Office of Administrative Hearings
(2023-DOES-000126)

(Argued February 14, 2024                    Decided August 15, 2024)

*Alec Z. Sandler*, with whom *Jonathan H. Levy* was on the briefs, for petitioner.

*Jeremy R. Girton*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for respondent.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and DEAHL and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: Kassahun Woldemdhin challenges a determination that he does not qualify for Pandemic Unemployment Assistance, or PUA, benefits. Woldemdhin began working as a taxi driver in 2015, but he stopped working for several months beginning on March 23, 2020, and he claims that he did so because

of a lack of fare-paying customers at the onset of the COVID-19 pandemic. He applied for PUA benefits—temporary benefits for workers who lost income for certain reasons as a result of the pandemic. His claim was initially denied on the basis that he stopped working "due to general concerns about exposure to COVID-19," not because of a lack of fare-paying customers. Woldemdhin appealed that determination to the Office of Administrative Hearings, where an Administrative Law Judge upheld the denial of benefits. Taking a slightly different tack, the ALJ found that Woldemdhin had not substantiated his claim that he had lost income as a result of the pandemic's outset, describing his claims on that front as "vague, conclusory, and uncorroborated."

We disagree. Woldemdhin's belief that he could not turn a profit driving a taxi during the first months of the pandemic was well-founded in the evidence, and there was no countervailing evidence. It does not even appear to have been a disputed point. Anybody who lived in the District during those early months of the pandemic could not reasonably doubt it, either. Because the ALJ's contrary determination was arbitrary and capricious, we reverse and direct that Woldemdhin be granted PUA benefits.

## I.  Factual Background

The relevant facts are largely uncontested, save for the parties' disputes about (1) whether Woldemdhin stopped driving his taxi because of a belief that he could no longer make any money, and (2) whether any such belief was substantiated. Woldemdhin worked as a taxi driver in the District beginning in 2015.  He was an independent contractor, and he rented both his vehicle and his meter system from United Ventures Consortium, or UVC.  The bulk of his income came from tourist fares.

That all changed, as so much else did, in March 2020, when the COVID-19 pandemic took the world by storm.  On March 11, 2020, Mayor Muriel Bowser declared a public health emergency in the District because of the COVID-19 pandemic.  That same day—in what is etched in some of our minds as the unofficial onset of the COVID-19 pandemic—the National Basketball Association announced it was indefinitely suspending the 2019-20 NBA season.  And just two days later, President Donald Trump declared a national emergency on March 13, 2020.

Within days, Woldemdhin came to realize that he could no longer make enough money to offset the cost of renting his vehicle and meter system, and he returned them to UVC on March 23, 2020, and stopped driving his taxi.  The next day, on March 24, 2020, the Mayor ordered all non-essential businesses to cease

operations. Mayor's Order 2020-053 at 6 (Mar. 24, 2020) ("the Shutdown Order").[1] Under the Shutdown Order, taxis and ride-sharing companies were considered essential businesses that could continue to operate. A week later, the Mayor issued a Stay-At-Home order that required "all individuals anywhere" in the District "to stay in their residences except to perform essential activities," such as receiving healthcare treatments, shopping, or "engag[ing] in essential business." Mayor's Order 2020-054 (Mar. 30, 2020) ("the Stay-At-Home Order").

Meanwhile, Congress passed the CARES Act, which created a system for administering PUA benefits to support people who lost income due to the pandemic. 15 U.S.C. § 9021. To be eligible for PUA benefits, a person must be ineligible for other state unemployment benefits,[2] *id.* § 9021(a)(3)(A)(i), and must be "otherwise able to work and available for work" but "unemployed, partially unemployed, or unable or unavailable to work because" of one of a variety of factors related to the COVID-19 pandemic. *Id*. § 9021(a)(3)(A)(ii)(I). One of those factors—listed at *id.* § 9021(a)(3)(A)(ii)(I)(kk), which we refer to simply as subsection (kk)—specified that a person was eligible for PUA benefits if "the individual meets any additional

---

[1] The ALJ consistently asserted that Woldemdhin stopped driving on March 25, but the parties agree that the correct date reflected in the evidence is March 23.

[2] The District of Columbia is considered a state for purposes of administering PUA benefits. 15 U.S.C. § 9021(a)(5).

criteria established by the Secretary [of Labor] for unemployment assistance under this section."

Within weeks, the Secretary of Labor issued a letter providing guidance as to when "certain gig economy workers" are eligible for PUA benefits. Unemployment Insurance Program Letter 16-20, p.2, § 3(b) (April 5, 2020) ("UIPL"). The Secretary then updated that letter several weeks later to make clear that "a driver for a ridesharing service who is forced to significantly limit his or her performance of customary work activities because of the COVID-19 public health emergency" is eligible for PUA benefits under subsection (kk). UIPL 16-20 Change 1, attach. I, p.10-11, § F(42-43) (April 27, 2020) ("Updated UIPL"). However, "an individual who does not go to work due to general concerns about exposure to COVID-19, and who does not meet any of the other COVID-19 related criteria for PUA, is not eligible for PUA." *Id.* On April 26, 2020, Woldemdhin applied for PUA benefits. He sought those benefits dating back to March, and ultimately through November 2020, when he resumed driving for hire (for Uber).

A claims examiner with the Department of Employment Services, or DOES, initially approved Woldemdhin for PUA benefits. But for reasons that are not clear from the record, DOES later initiated a review of Woldemdhin's PUA benefits and

eventually sent Woldemdhin a letter directing him to repay roughly $15,000 in PUA benefits that he had received but was allegedly not entitled to.

Woldemdhin contested that decision and responded to the DOES letter with evidence that he was eligible for PUA benefits. In his response, he provided (1) a letter from UVC stating he had ended his taxi rental on March 23, 2020, (2) his 2019 and 2020 1099-K forms detailing his monthly earnings in those years, which showed that his March 2020 income was only about a quarter of his March 2019 income, and (3) a statement written on a DOES form that Woldemdhin signed, but which was apparently written for him by a DOES employee (because, as Woldemdhin later testified through a translator, his English was limited). That form listed "Fear of Catching Covid" as the reason he stopped driving his taxi. A claims examiner considered this additional evidence and upheld the earlier determination that Woldemdhin was ineligible for PUA benefits. The examiner reasoned that Woldemdhin was ineligible for PUA benefits—consistent with the Secretary of Labor's guidance—because he "voluntarily quit due to the fear of contracting COVID-19 from patrons," not because he could no longer make any income driving a taxi.

Woldemdhin appealed that decision to OAH, where he received an evidentiary hearing before an Administrative Law Judge. During the hearing,

Woldemdhin testified that fear of catching COVID-19 was not the primary reason that he stopped driving his taxi. He had simply responded in the affirmative when asked by the DOES employee if he had been afraid of catching COVID-19, and she then in turn listed that as the reason he deactivated his taxi when she filled out the form for him. He explained, through a translator:

> So the letter . . . is not the letter that I wrote. It's the letter that Patricia Jackson wrote. She was one of the person that was following my case. She told me to write a letter and I told her, I don't have the skills to write a letter since English is my second language. So she said, I can help you write the letter. And she wrote the letter for me, and she asked me questions like, Were you afraid that you might catch the COVID? And I told her, Yes, I was afraid that . . . I might catch the COVID.

Woldemdhin confirmed that he was not "able to read the [letter] and understand the document before [he] signed it," and he said that he "just knew that [Jackson] was being kind to write that letter and she was—she did that to help me, so to be honest, I didn't understand each and every word hundred percent." Woldemdhin then conceded that "it was [his] decision to stop driving for UVC," but explained that he made that decision because he "was sure that [he] wouldn't make any income even if [he] worked."

After the hearing, the ALJ upheld the decision to deny PUA benefits. Unlike the claims examiner, the ALJ did not place any reliance on the DOES form letter that Jackson drafted which stated that Woldemdhin quit due to a fear of catching

COVID-19. The ALJ also rejected an argument made by Woldemdhin's attorney that he was eligible for benefits because he could not work as a result of the Mayor's Stay-At-Home order, which by itself would have made him eligible for benefits under a section of the CARES act that is not relevant here. *See* 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ee). The ALJ rejected that argument both because Woldemdhin stopped driving several days before that order took effect and because the order exempted taxi drivers. That aspect of the ALJ's ruling is not challenged now.

The ALJ then considered the critical question before us, which is whether Woldemdhin quit because he "experienced a significant diminution of [his] customary or usual services because of the COVID-19 public health emergency." The ALJ concluded that Woldemdhin's testimony on that point was "vague, conclusory, and uncorroborated." She continued that Woldemdhin presented "no financial records" comparing his pre-March 2020 income to the narrow stretch of time during March 2020 where he still drove his taxi, so that there was "nothing in the record aside from [Woldemdhin's] fundamentally flawed reasoning" connecting the pandemic to his loss of income. The ALJ expressly did not credit Woldemdhin's "testimony that a reduced volume of tourists in the District . . . related to the pandemic was the direct cause of an asserted diminution" of his income because he provided no "substantial evidence" to support that claim.

Woldemdhin now petitions this court for review.

## II. Analysis

Our review of OAH decisions is limited. We will "affirm an agency's decision 'if the decision contains findings on each material, contested issue of fact; substantial evidence supports each factual finding; the decision's legal conclusions flow rationally from the factual findings; and the decision is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.'" *Fort Myer Constr. Corp. v. Briscoe*, 298 A.3d 770, 775-76 (D.C. 2023) (per curiam) (quoting *Tyler v. George Washington Med. Fac. Assocs.*, 75 A.3d 211, 213 (D.C. 2013)). We conclude that the ALJ's decision was arbitrary and capricious, and at points unsupported by substantial evidence, for several reasons.

### A. Woldemdhin's Undisputed Testimony Established His Eligibility

The ALJ acted arbitrarily and capriciously when she concluded that Woldemdhin had not sufficiently substantiated his claim that his income from driving his taxi was significantly diminished during the early weeks of the pandemic. To put a point on it, we do not see how anybody who lived in the District during the pandemic's onset could possibly doubt Woldemdhin's testimony on this subject. Consider this graph, from the District's own Department of Vehicles For Hire,

estimating the average daily taxi trips in the District throughout 2020 (we have modified it to add a dot representing when Woldemdhin returned his taxi and meter on March 23, 2023):



**Taxi Trips in 2020 (Average Daily Trips)**

While that graph was not before the ALJ, we do not rely on it in its particulars. *Cf. Bostic v. District of Columbia*, 906 A.2d 327, 332 (D.C. 2006) ("[W]e may take judicial notice of . . . matters of public record."). We instead rely on it as illustrative of what could only be described as our irrefutable shared experience that people were not leaving their homes much, and tourism had quickly bottomed out in the District, once the COVID-19 pandemic became our reality in early-to-mid March 2020 (and for many months thereafter).

Woldemdhin testified that by the time he turned in his taxi and meter on March 23, he "was sure that [he] wouldn't make any income even if [he] worked." It is in some sense true that he did not present a trove of evidence substantiating that testimony (though he presented a fair bit, as discussed in the next section), but it was undisputed—and in our view, beyond reasonable dispute—that Woldemdhin's belief was well-founded. At no point did any witness, DOES attorney, or any prior determination (of a claims examiner, for example), suggest that Woldemdhin's claim should fail because of a lack of evidence that the taxi industry had been ravaged by the onset of the pandemic. Woldemdhin's burden did not extend to proving obvious and irrefutable points, like that the pandemic significantly restricted peoples' movements and use of taxis. While factfinders should of course follow the evidence even when it is contrary to their own prior beliefs, they should not cast undue skepticism on undisputed points, acting as a tabula rasa in need of firm evidence to prove what the human experience and unrefuted evidence makes evident enough.

To elaborate more on the conditions in the District in the days before Woldemdhin deactivated his taxi: On March 16, 2020, this court cancelled all oral arguments for the remainder of the month. D.C. Ct. of App. Order (March 16, 2020). One week later (the day Woldemdhin returned his taxi and meter) this court cancelled arguments through the end of May. D.C. Ct. of App. Order (March 23, 2020). Similarly, on March 18, 2020, the District's Superior Court suspended all

jury trials and suspended virtually all other non-emergency proceedings. D.C. Super. Ct. Order (March 18, 2020). For the ALJ to have closed her eyes to the pandemic's realities, all because Woldemdhin did not provide conclusive proof to support what was in any event unrefuted, was capricious. *See*, *e.g.*, *Chesapeake and Potomac Tel. Co. v. Pub. Serv. Comm'n of D.C.*, 514 A.2d 1159, 1171-72 (D.C. 1986) (holding that it was arbitrary and capricious to make rate decisions based on data known to be false).

Anyone who lived through March 2020 knows from direct experience that tourism dried up in the District—and throughout most of the world—and that people started working from home. Both of those things would obviously substantially diminish the demand for taxi services. It was arbitrary and capricious for the ALJ to demand any more evidence from Woldemdhin beyond his undisputed testimony.[3]

---

[3] Woldemdhin argues that because the CARES Act permitted him to self-certify his eligibility for PUA benefits, DOES was in fact forbidden from later demanding that he substantiate that eligibility with evidence. We disagree. The Secretary of Labor explicitly instructed that "when investigating the potential for fraud and improper payments, the state has . . . [the] authority to request supporting documentation about [the] COVID-19 related reason" justifying the PUA benefit, as DOES did here. Updated UIPL, attach. I, p.9. So while DOES was permitted to request that Woldemdhin substantiate his claim—though he had no reason to think DOES was seeking substantiation for the particular fact that the taxi industry had tanked by the time he stopped driving—he more than adequately did that.

## B. Woldemdhin Substantiated his Claim with Evidence

While it was perhaps overkill, Woldemdhin did in fact substantiate his claim with powerful evidence that he lost the vast majority of his income as a result of the pandemic, and the ALJ simply overlooked it. While the ALJ asserted that Woldemdhin "presented no financial records . . . comparing his pre-March 2020 income with his income between March 10, 2020 and March 25, 2020," *see supra* n.1, Woldemdhin in fact presented evidence that was stronger than that, but it went overlooked by the ALJ. Woldemdhin's 1099-K for 2020 showed that he made $1,887.69 in January, $2,210.84 in February, and only $917.14 in March. That is, in March 2020, Woldemdhin made about 49% of what he made in January, and about 41% of what he made in February of that same year. Compare that to the previous year, where Woldemdhin's 1099-K from 2019 showed that he made $2,684.31 in January, $2,427.86 in February, with a significant spike to $3,498.11 in March (as one would naturally expect as the tourism season kicks into gear). So Woldemdhin's March 2020 income was just 26% of what it was in March 2019, and sharply dropped off relative to prior months where the previous year it had increased. To demand more specific evidence than that on what was essentially an uncontested point is capricious.

The District's response is unpersuasive. It argues that the 1099-Ks "do not break Woldemdhin's income down by day or week, so they merely confirm that Woldemdhin quit his job sometime during March 2020." That vastly understates the strength of the above 1099-K evidence. It does not just show that he stopped driving his taxi at some point during March, but that he made only about a quarter of the income he had made in March of the previous year, suggesting that fares had dried up long before he returned his taxi on March 23. In any event, the ALJ did not even attempt to reconcile the above 1099-K evidence with her ruling. The ALJ instead faulted Woldemdhin for presenting "no financial records . . . comparing his pre-March 2020 income with his income between March 10, 2020 and March 2[3], 2020." But his 1099-K from 2020 was pretty close to that mark: it showed precisely how his income had dropped precipitously in March 2020, as compared to January and February of that year (his "pre-March 2020 income"). And it also showed how it had dropped to about a quarter of his March 2019 income. It is true enough that he did not further break down his March 2020 income to focus exclusively on March 10 to March 23, but it is hard to see how Woldemdhin's failure to present such hyper-tailored evidence should be held against him when (1) nobody asked for that particular breakdown of his income, (2) in any event, such evidence would have been far less probative than the evidence he actually did present (if fares had already

bottomed out during those first nine days of March, that would not be any point against granting Woldemdhin PUA benefits).

## C.  The District's Alternative Basis for Affirmance Is Unconvincing

Finally, the District argues that even if Woldemdhin did substantiate his claim of lost income due to the pandemic, that is entirely consistent with his quitting out of fear of contracting COVID-19.  And a person who stopped working exclusively because of "general concerns about contracting COVID-19" is not eligible for PUA benefits.  Updated UIPL, attach. I., p.10-11, § F(42-43).  In this argument, the District invites us to revive the claims examiner's conclusion that the real reason Woldemdhin stopped driving was out of fear of catching COVID-19, not because he could not make any money at the time, and asking us to affirm on that basis.  We reject that invitation: Woldemdhin would only be ineligible for PUA benefits if he stopped working *solely* out of concerns about contracting COVID-19, and we conclude that the evidence simply cannot support such a finding.  As the updated UIPL explicitly states, "an individual who does not go to work due to general concerns about exposure to COVID-19" is not eligible for PUA only if they do "*not meet any of the other COVID-related criteria* for PUA," such as the pandemic diminishing their income.  Updated UIPL, attach. I, p. 10-11, § F(42-43) (emphasis added).

Recall the evidence on this point: Woldemdhin testified at an evidentiary hearing before the ALJ that he "was sure that [he] wouldn't make any income even if [he] worked" and that is why he returned his taxi in March 23, 2020. The ALJ did not question the sincerity of that belief, but concluded (capriciously, in our view) that Woldemdhin's testimony was so conclusory that it could not be credited. The District now asks us to reject his testimony because of a letter he signed—written on his behalf by a DOES staffer because his English was limited—which summarizes Woldemdhin as saying that he voluntarily quit his job as a taxi driver "due to fear of catching COVID-19." When he was pressed about that statement during the hearing before the ALJ, he explained that the staffer asked if he was "afraid that [he] might catch the COVID," and he "told her, Yes, I was afraid that . . . I might catch the COVID."

We do not think that is substantial evidence from which one might conclude that Woldemdhin quit driving *solely* out of concerns about contracting COVID-19, especially in light of his contrary and cogent testimony on this point. Not being able to make any money, and fear of catching COVID-19, are simply not mutually exclusive bases to stop driving a taxi. They are complementary ones. To illustrate the point, if you were making $900 a month (Woldemdhin's March 2020 income) driving a taxi at the height of the pandemic, you might decide that the risk of catching COVID-19 is reason enough to give up that income stream. But it does not at all

follow that the same fear would motivate you to walk away from a $3,500 a month income stream (what Woldemdhin made in March 2019). Woldemdhin's testimony that he quit driving because he was not making income is thus not in the slightest tension with the written statement listing fear of catching COVID as a reason he deactivated his taxi (why risk an infection for nothing?).

That is particularly true here, where the undisputed evidence was that Woldemdhin could not even read the written statement that was drafted on his behalf and that he ultimately signed. We have explained, in a situation that mirrors the one before us today: "Despite the fact that [claimant] placed his signature on the statement, it is clear that he did not read or write English, and did not know precisely what it said. Under these circumstances, [his] sworn testimony before DOES effectively contradicted any inference from the written statement," so that the "written statement was of little, if any, probative value." *See Jadallah v. D.C. Dep't of Emp't Servs.*, 476 A.2d 671, 676-677 (D.C. 1984) (per curiam). We reach the same conclusion in this case.

### III. Conclusion

For the foregoing reasons, we reverse the ALJ's ruling, conclude that Woldemdhin is eligible for PUA benefits, and remand for calculation of those benefits.

*So ordered.*